# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DAVID TODD MEHNERT**
        **Plaintiff,**

    **v.**                            **Case No. 21-C-0012**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

## <u>DECISION AND ORDER</u>

Plaintiff David Todd Mehnert, proceeding pro se, seeks judicial review of the denial of his application for social disability insurance benefits ("DIB"). The court construes pro se filings liberally, but a litigant still must develop cogent legal arguments with citations to authority and relevant parts of the record. <u>Greenwell v. Saul</u>, 811 Fed. Appx. 368, 370 (7th Cir. 2020) (citing <u>Anderson v. Hardman</u>, 241 F.3d 544, 545 (7th Cir. 2001)). Plaintiff develops no argument as to how the Administrative Law Judge ("ALJ") erred in denying his claim. <u>See Cadenhead v. Astrue</u>, 410 Fed. Appx. 982, 984 (7th Cir. 2011) ("In her brief to this court, Cadenhead has not developed an argument challenging the ALJ's reasons for denying benefits."). Plaintiff attaches to his brief various additional medical records, but the correctness of an ALJ's decision is based on the evidence that was before him, <u>Eads v. Sec'y of Health & Human Servs.</u>, 983 F.2d 815, 817 (7th Cir. 1993), and plaintiff develops no argument that the court should remand for consideration of new and material evidence under 42 U.S.C. § 405(g), sentence six. <u>See Perkins v. Chater</u>, 107 F.3d 1290, 1296 (7th Cir. 1997) (discussing the requirements for a sentence six remand). I accordingly affirm the ALJ's decision and dismiss this action.

# I. LEGAL STANDARDS

**A.    Disability Standard**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act "requires that an individual 'furnish[] such medical and other evidence' of a disability in order to qualify for benefits."  Wilder v. Kijakazi, 22 F.4th 644, 651 (7th Cir. 2022) (quoting 42 U.S.C. § 423(d)(5)(A)).

Eligibility for disability benefits is determined by applying a five-step analysis, in which the ALJ considers whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other jobs existing in significant numbers in the national economy.  Butler v. Kijakazi, 4 F.4th 498, 501 (7th Cir. 2021).  "A finding of disability requires an affirmative answer at either step three or step five.  The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner."  Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  To meet this burden, ALJs generally obtain testimony from a vocational expert ("VE") regarding jobs the claimant could perform in light of his limitations.  Butler, 4 F.4th at 501.  Finally, in order to obtain DIB, the claimant must establish that the disability arose while

2

he was "insured" for benefits.  <u>Briscoe</u>, 425 F.3d at 348.

**B.    Standard of Review**

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the conclusions.  <u>Jeske v. Saul</u>, 955 F.3d 583, 587 (7th Cir. 2020).  Substantial evidence is relevant evidence that a reasonable mind could accept as adequate to support a conclusion. <u>Id.</u>  The reviewing court will not re-weigh the evidence, resolve debatable evidentiary conflicts, re-determine credibility, or substitute its judgment for the ALJ's determination so long as substantial evidence supports it.  <u>Gedatus v. Saul</u>, 994 F.3d 893, 900 (7th Cir 2021).  In DIB cases, the court reviews only the ALJ's finding that the claimant was not disabled as of his date last insured ("DLI"), not any argument that he is currently disabled.  <u>Schloesser v. Berryhill</u>, 870 F.3d 712, 717 (7th Cir. 2017).

## II.  FACTS AND BACKGROUND

**A.    Plaintiff's Application and Agency Decisions**

Plaintiff applied for benefits in October 2018, alleging a disability onset date of June 5, 2015.  (Tr. at 156.)  His DLI was September 30, 2017.  (Tr. at 62.)  Accordingly, plaintiff had to establish that he became disabled between June 5, 2015, and September 30, 2017.

In his disability report, plaintiff listed impairments of arthritis, lung cancer, tendinitis, angioedema,[1] asthma, short term memory loss, stroke, knee problems, borderline diabetes, and

---

[1]Angioedema is swelling beneath the skin.  It can happen at many points on the body, including the face, throat, arms, hands, legs, or feet.  It can also happen around the genitals and in the intestines.  There are four types of angioedema: allergic, drug-induced, hereditary, and idiopathic. https://www.webmd.com/skin-problems-and-treatments/angioedema-overview (last visited February 15, 2022).

curved spine. He indicated that he stood 5'9" and weighed 250 pounds. (Tr. at 182.) He listed previous employment as a carpenter and cleaner. (Tr. at 184, 200-01.) He indicated that he used Advair and ProAir (albuterol) for his asthma. (Tr. at 185.)

In a function report, plaintiff indicated that he could not kneel, stand, or walk for long because his knees were shot. If he got stung, cut, or injured, his angiodema caused swelling internally and externally. He also experienced asthma attacks in the spring and fall, blaming allergies. (Tr. at 189.) He reported some issues dressing due to stiffness but no other problems with personal care. (Tr. at 190.) He cooked, cleaned, mowed the lawn, and shopped. (Tr. at 191-92.) Hobbies included watching TV and gardening. (Tr. at 193.) He alleged that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and use his hands. (Tr. at 194.) He indicated that he had used a cane or knee braces for at least 15 years. (Tr. at 195.) In a physical activities addendum, plaintiff indicated that he could continuously sit for two hours, stand for one to three hours, and walk for one hour. In a day, he could sit for one to three hours, stand for one to three hours, and walk for two to three hours. His doctors had not limited the amount he could lift. (Tr. at 197.)

The agency denied the application initially on January 7, 2019 (Tr. at 83), based on the review of William Fowler, M.D., who found that plaintiff had no severe impairments (Tr. at 61, 65-66). Plaintiff requested reconsideration (Tr. at 92), but the agency denied that request on April 30, 2019 (Tr. at 93), based on the review of James Greco, M.D., who also found plaintiff's alleged impairments non-severe (Tr. at 70, 74-75.)

On June 4, 2019, plaintiff requested a hearing before an ALJ. (Tr. at 99.) On November 4, 2019, the agency scheduled the hearing for February 12, 2020. (Tr. at 117.) On February

4

4, 2020, plaintiff's counsel submitted a letter indicating certain records had not been obtained. (Tr. at 243-44.) On February 7, 2020, counsel submitted records. (Tr. at 301, 346, 450.)

## B.    Medical Evidence Before the ALJ

The record contains no medical evidence from June 2015 (the alleged disability onset) to April 2017. The records from the remainder of the relevant period (through September 30, 2017) relate primarily to asthma.

On April 10, 2017, plaintiff saw Jessica Morgan, APNP, for a routine physical exam, as a new patient to the clinic. He asked for a chest x-ray based on previous asbestos exposure. He also stated that he was diagnosed with lung cancer in 2011 (although no such diagnosis was noted in his records), treating it with vitamins. He stated that at one point he had coughing spells and coughed up two "grey-blue plugs," after which his lungs were "clear." He also had a history of asthma, for which he used Advair twice daily with ProAir on hand as well. "He feels his symptoms are well controlled. Allergies can make his symptoms spike." (Tr. at 262.) His past medical history included asbestos exposure, stroke, and tobacco use. The note indicated that he "Works construction" and "Enjoys biking." (Tr. at 262.) He used marijuana three times per week. On review of systems, he denied cough or shortness of breath, chest pain or palpitations, abdominal pain, joint pain or swelling, or neurologic symptoms. He stood 5'9" and weighed 219 pounds. (Tr. at 263.) On exam, he appeared healthy and in no acute distress; with normal respirations, good lung expansion, clear to auscultation with no extra sounds; normal bowel sounds, with no abdominal tenderness; normal spine range of motion, normal muscles, and joints without abnormalities. (Tr. at 263-64.) NP Morgan assessed: "Generally healthy adult male." She placed a referred for a colonoscopy and made diet/exercise recommendations. Based on a chest x-ray, which revealed no acute cardiopulmonary disease

5

(Tr. at 279), she did not believe plaintiff needed a lung CT at that time (Tr. at 264).

On April 24, 2017, plaintiff saw Marla Wolfert, M.D., for his colonoscopy. The note listed diagnoses of obesity and mild intermittent asthma. On exam, plaintiff's lungs were clear to auscultation, and his abdomen soft and non-tender. (Tr. at 252.) The colonoscopy revealed diverticulosis and small internal hermorrhiods; it was recommended plaintiff eat a high fiber diet and have a repeat colonoscopy in 10 years for screening purposes. (Tr. at 253.)

On November 16, 2017, plaintiff saw NP Morgan for follow up of his asthma, stating that his symptoms had improved. He indicated he was allergic to dogs and recently tore out all of the carpet in his house to reduce allergens. He used Advair twice daily and albuterol as needed. He further indicated that he started smoking marijuana around 1985 because of chronic knee and ankle pain (and also because it was fun). He stated that marijuana helped reduce pain and made him less nervous. He stopped around the end of September due to cost. Since quitting, his chronic ankle and knee pain had returned, and he asked about marijuana oil. He further stated that he had been diagnosed with angiodema. He would swell up in his extremities if he got a sliver of any sort. He stated his last flare was six months ago; it usually resolved in about three days; he did not recall any particular treatment recommendations. He also discussed some personal issues with his marriage and indicated that "his last boss blacklisted him, so now he cannot get a job." (Tr. at 265.) His active problem list included mild intermittent asthma and obesity. (Tr. at 265.) On exam, he appeared healthy and in no acute distress, with normal respirations, good lung expansion, clear to auscultation with no extra sounds. NP Morgan assessed mild intermittent asthma without complication and other chronic pain. She refilled albuterol and indicated she did not prescribe marijuana oil; plaintiff declined other non-narcotic pain medication or referral to a specialist.

6

(Tr. at 266.)

On April 11, 2018, plaintiff saw NP Morgan for a routine physical exam, requesting a repeat chest x-ray. He indicated that weather changes affected his breathing, as did allergy season. He further indicated he had gained 20 pounds in the last year. (Tr. at 267.) He was not currently working. On review of systems, he reported no rashes or lesions of concern, an occasional twinge on either side of his rib cage and coughing in the morning, no gastrointestinal symptoms, and no joint pain or swelling. (Tr. at 268.) On exam, he stood 5'9" and weighed 250 pounds. He appeared healthy, alert, and in no acute distress, with normal skin, normal respirations, normal bowel sounds, and good range of motion. NP Morgan assessed a generally healthy adult male. (Tr. at 269.) She reviewed diet/exercise recommendations, would consult with pulmonology before getting a chest x-ray, and increased Advair.[2] (Tr. at 269-70.)

On August 3, 2018, plaintiff was seen for a shoulder injury sustained when he fell backwards and caught himself with his outstretched right arm. He reported a history of right shoulder pain after an injury about 13 years ago, which was never medically evaluated and had resolved within the last couple years. (Tr. at 271.) An x-ray revealed mild degenerative changes with no acute findings. (Tr. at 277.) The provider assessed a right shoulder injury, recommending conservative measures. (Tr. at 273.)

On November 20, 2018, plaintiff saw NP Morgan for a routine physical exam,

---

[2]On June 5, 2018, plaintiff had an eye exam. (Tr. at 294.) On August 24, 2018, he underwent a lung CT, which revealed a few tiny non-calcified pulmonary nodules. It was suggested he undergo a repeat CT in 12 months. (Tr. at 255-56.) A November 7, 2018, note included a problem list of mild intermittent asthma and obesity. The medical history section listed asbestos exposure, stroke, and tobacco use. (Tr. at 260.) The note also referenced daily marijuana use. (Tr. at 261.)

7

complaining about right shoulder pain, weight gain, and swelling over various areas of his body. (Tr. at 508.) They discussed diet and exercise. He declined a referral to orthopedics. (Tr. at 510.)

On January 14, 2019, plaintiff saw NP Morgan complaining of low back pain since the August 2018 fall. (Tr. at 510.) She referred him for physical therapy. (Tr. at 511.) He was seen in therapy once, on January 16, 2019 (Tr. at 512-16), cancelling the rest of his visits due to weather (Tr. at 517).

On February 28, 2019, plaintiff presented to NP Morgan "with a request to have angiodema written in his record, which he states he needs to have in order to get disability." (Tr. at 517.) He stated he was told by a doctor in Fond du Lac that he had angiodema 15 years ago. He wasn't given any treatment options and believed there was nothing he could do about it. The symptoms initially involved his legs and arms but had now gone internal. He thought his maternal grandmother had angiodema but was not certain. "When asked if his symptoms prevent him from working, he states the last time he was symptomatic, symptoms lasted for a month. He states he cannot walk, kneel or grip anything when he has a flare. He states he is working with a disability specialist who said he has to have something documented, because there isn't anything documented for the past 10 years." (Tr. at 517.) On exam, NP Morgan noticed rash on the back of the left upper arm, but she noted no swelling. She assessed "angiodema, initial encounter." (Tr. at 518.) She concluded: "Pt reports a long-standing history of angiodema, but this is the first visit to this office for this reason. He requests to have documentation in his chart regarding this diagnosis. He declines referral to allergy at this point due to weather and lack of a vehicle that he trusts. He will schedule a physical in April and consider referral to allergy at that time[.]" (Tr. at 518.)

8

In March 2019, plaintiff resumed physical therapy for low back pain. (Tr. at 519-30.) On April 9, 2019, he saw NP Morgan for a routine physical exam and refill of his inhalers. (Tr. at 530.) Regarding asthma, he felt "like he is doing the best he ever has." (Tr. at 530-31.) "He is also requesting a note stating he can return to work. He is dealing with a right arm and low back injury that occurred when he was helping an acquaintance. He wasn't able to do his usual work of doing plaster work. He was seen in PT for left lumbar pain, with his last visit 3/27/2019 he met or partially met all of the goals and was discharged at that time. He believes his attorney was requesting a note. He states he can lift his arm and he has good ROM of his back, so he is ready to go back." (Tr. at 531.) On review of systems, plaintiff noted cough in the morning and some shortness of breath, no gastrointestinal symptoms, no joint pain or swelling, and no neurologic symptoms. (Tr. at 532.) On exam, he appeared healthy and in no acute distress, with no rashes, and normal respirations. (Tr. at 532-33.) NP Morgan assessed a generally healthy adult male, with obesity and mild intermittent asthma without complication. "He is doing better than he has in the past." (Tr. at 533.)

On April 23, 2019, plaintiff saw NP Morgan for continued right shoulder pain. "He went back to working on his house, doing plaster work. He states the pain in his right arm returned." (Tr. at 534.) She assessed chronic right shoulder pain, referring him to physical therapy. (Tr. at 534-35.) A May 8, 2019, therapy note indicated that plaintiff experienced a severe increase in pain three weeks ago. "Pt is self employed in construction-plaster finish; Pt stopped working due to his back pain but that improved, he returned to work 1 day and did not finish the day due to increased arm pain." (Tr. at 535; see also Tr. at 350, 541, 543, 545, 548.) On May 29, 2019, plaintiff's therapist held the use of "KT" due to skin responses and angiodema

9

responses.[3]  (Tr. at 351.)

On May 31, 2019, plaintiff saw Dr. Scott Haskins for evaluation of bilateral knee pain. He reported a long history of knee pain, which had gotten progressively worse.  He had difficulty finding jobs due to pain.  (Tr. at 352.)  Dr. Haskins assessed osteoarthritis, recommending right knee arthroplasty.  (Tr. at 355-56.)

Plaintiff continued in physical therapy for his right shoulder in June 2019, reporting no reduction in pain.  (Tr. at 356-68.)  He also had therapy for his knee.  (Tr. at 370-76.)  On July 15, 2019, he saw NP Morgan for a preoperative exam (Tr. at 376), and on August 1, 2019, he underwent right knee surgery (Tr. at 383), followed by more therapy (Tr. at 385-432).

On October 4, 2019, plaintiff saw Dr. Haskins about his right shoulder, his symptoms bothersome but tolerable.  He was to continue with conservative measures.  (Tr. at 432-36.)

On October 22, 2019, plaintiff was seen in urgent care, requesting documentation in his chart of an episode of angiodema.  (Tr. at 437.)  On exam, the provider noted no respiratory distress or swelling of the lips, face, or tongue, but swelling of the hands, wrists, feet, ankles, and scrotum. The provider prescribed prednisone and Zyrtec.  (Tr. at 439.)  On October 23, 2019, plaintiff followed up with NP Morgan, indicating he did not start the prednisone because he knows the swelling will soon resolve on its own, and he often gets stomach upset from medications.  He also stated the Zyrtec was not helping.  (Tr. at 440.)  NP Morgan indicated work-up of angiodema was best done by an allergist and made a referral.  (Tr. at 441.)

On October 25, 2019, plaintiff followed up with Dr. Haskins.  At the knee, he was doing

_____

[3]I assume this is a reference to kinesiology tape, which is believed to alleviate pain, reduce inflammation, and help with rehabilitation as well as supporting muscles during exercise.  https://www.webmd.com/fitness-exercise/features/kinesio-tape-athletes-help-hype (last visited February 14, 2022).

10

very well, regaining essentially full motion. He did have angiodema throughout his extremities that caused more pain last week. His shoulder pain persisted, with difficulty reaching, pushing, and pulling. (Tr. at 442.) On December 4, 2019, plaintiff underwent right rotator cuff repair surgery (Tr. at 443-46), followed by a course of physical therapy (Tr. at 305-09, 312-21, 329-45, 447-9).

On December 19, 2019, plaintiff saw NP Morgan concerned about his blood pressure. At that time, he also requested labs to find out if his angiodema was hereditary or idiopathic. His active problem list at that time included mild intermittent asthma, obesity, osteoarthritis of the right knee, angiodema, and right shoulder injury. (Tr. at 310.) NP Morgan started him on medication for high blood pressure but declined labs for angiodema, reminding plaintiff he had been referred to the appropriate specialty to discuss testing. (Tr. at 311.)

On January 7, 2020, plaintiff saw Dr. Jeffrey Shaw for an allergy work-up (angiodema). He reported recurrent episodes of angiodema since age 12. "Despite the recurrent episodes of angiodema and a family history of recurrent episodes of swelling in his grandmother, he has never had an evaluation for hereditary angiodema." (Tr. at 322.) Plaintiff reported that swelling could be brought on by blunt force injuries, cuts, and sleeping on his arms, with the swelling tending to last three days before resolving. He also reported frequent episodes of abdominal discomfort and constipation he felt were related to swelling in his abdomen. Dr. Shaw noted that he had been started on lisinopril for high blood pressure, a medication that could actually trigger angiodema. (Tr. at 322.) Plaintiff reported that he has been unable to work due to the episodes of swelling. (Tr. at 323.) Dr. Shaw assessed recurrent episodes of angiodema with a family history. He ordered labs to further evaluate these episodes and recommended a change in blood pressure medication. (Tr. at 326.) On January 8, 2020, NP Morgan changed

11

the medication.  (Tr. at 327-28.)

**C.    Hearing**

On February 12, 2020, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also summoned a VE.  (Tr. at 30.)

At the outset of the hearing, plaintiff's counsel indicated that all evidence related to plaintiff's alleged disability had been submitted.  (Tr. at 33.)  The ALJ asked plaintiff's counsel to identify the severe impairments, and counsel mentioned diverticulitis, history of angiodema, and obesity, as well as surgeries to the knee and shoulder after the DLI.  (Tr. at 34.)  The ALJ confirmed that plaintiff made a DIB claim only, with a DLI of September 30, 2017.  (Tr. at 34.) The ALJ further noted that the agency did not find a severe impairment, and that many of the records in the file were after the DLI.  (Tr. at 34-35.)  Asked to explain the theory of the case, plaintiff's counsel indicated that testimony would be helpful to go over why plaintiff's work ended and what he was experiencing.  (Tr. at 35.)  Counsel confirmed that no Listing was met, and that there was no opinion evidence related to plaintiff's ability to function prior to the DLI. (Tr. at 35.)

The ALJ preceded his questioning by noting that the period at issue was 2015-17.  (Tr. at 36.)  The ALJ noted that plaintiff had a cane, which he bought in 2008; his doctor did not prescribe it.  (Tr. at 37.)  Asked how much he could lift prior to the DLI, plaintiff said he could lift 80 pound bags of concrete.  Asked how long he could stand or walk, plaintiff said he was good with a six-hour day, but working longer than that was problematic.  He could sit about an hour or so.  (Tr. at 38.)  He could use his hands, except for when he swelled up, which had been happening since he was a child.  (Tr. at 38-39.)  He explained that he swelled up from allergies or blunt injuries.  (Tr. at 39.)  He indicated that his angiodema symptoms had always

12

been external but around 2002 he started having internal issues, causing gastrointestinal symptoms. (Tr. at 40.) In 2018, he injured his shoulder during a fall. (Tr. at 41.)

Plaintiff's counsel asked about asthma, which plaintiff indicated he also had since childhood. His symptoms were triggered by different allergens and by heavy exertion. (Tr. at 43.) He used inhalers. (Tr. at 44.)

Plaintiff testified that his work ended in 2015. His employer had accommodated him with no kneeling jobs, but he was then assigned a tiling job which aggravated his knee. (Tr. at 44.)

Counsel also asked about angiodema, which plaintiff said was set off by cuts or abrasions. As far as he knew, there was no treatment for this condition so he did not waste money going to the hospital during his episodes. (Tr. at 45.) The swelling had gotten pretty bad since his recent surgeries. (Tr. at 46.)

The VE classified plaintiff's past work as construction carpenter, medium generally, heavy as plaintiff did it, and cleaner, heavy generally, light as plaintiff did it. (Tr. at 48-49.) The ALJ then asked a hypothetical question assuming a person with no exertional limitations who had to avoid concentrated exposure to environmental irritants. (Tr. at 49.) The VE testified that such a person could perform both of plaintiff's past jobs, as well as other jobs such as assembler, stock worker, and packager. (Tr. at 49-50.) The ALJ then asked a series of additional hypotheticals adding exertional limitations to the medium, light, and sedentary levels, which still permitted work. (Tr. at 50-53.) The ALJ also asked about allowable time off task and absenteeism. (Tr. at 54.)

**D.    ALJ's Decision**

On April 13, 2020, the ALJ issued an unfavorable decision. (Tr. at 13.) At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity during the period

13

from his alleged onset date of June 5, 2015, through his date last insured of September 30, 2017. (Tr. at 18.)

At step two, the ALJ determined that through the DLI plaintiff had the severe impairment of asthma. The ALJ noted that the medical records referenced other impairments, including obesity, substance abuse disorder, diverticulitis, and hemorrhoids. However, these conditions did not require significant treatment and/or did not cause more than minimal limitations on plaintiff's ability to perform basic work functions. (Tr. at 18.) The ALJ thus found these impairments non-severe. (Tr. at 18-19.) The records also referenced a history of stroke, and plaintiff alleged that he had been diagnosed with lung cancer in 2011. He also alleged ankle and knee pain. The ALJ found that these were not medically determinable impairments, as the record contained no diagnostics or specific clinical findings from an acceptable medical source. (Tr. at 19.) Finally, the records documented additional impairments after the date last insured, but there were no medical signs or laboratory findings to substantiate the existence of these impairments during the relevant period. (Tr. at 19.)

At step three, the ALJ determined that plaintiff's respiratory impairment did not meet or medically equal a Listing. (Tr. at 19-20.) The ALJ also considered plaintiff's obesity using the criteria for musculoskeletal impairments, finding that this condition was also not of Listing-level severity. (Tr. at 20.)

Prior to step four, the ALJ determined that plaintiff had the RFC to perform a full range of work at all exertional levels but needed to avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases. In making this finding, the ALJ considered plaintiff's statements concerning his symptoms and limitations, as well as the medical opinion evidence. (Tr. at 20.)

14

Regarding the symptoms, the ALJ acknowledged the required two-step evaluation process, under which he first had to determine whether plaintiff suffered from an underlying medically determinable impairment that could reasonably be expected to produce the alleged symptoms. Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limited his functioning. At this second step, if the statements were not substantiated by the objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 20.)

In his initial disability report, plaintiff alleged that he was unable to work due to arthritis, lung cancer, tendinitis, angiodema, asthma, short-term memory loss, stroke, knee problems, borderline diabetes, and curved spine. In a function report, plaintiff asserted that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and use his hands. He estimated that he could sit for two hours, stand for one to three hours, and walk for one hour without a break. (Tr. at 20.) He further indicated that his symptoms interfered with sleep and the ability to perform various activities of daily living. (Tr. at 20-21.) He reported the use of a cane and knee braces. The ALJ noted that plaintiff prepared this report in October 2018, more than a year after the date last insured. (Tr. at 21.)

After careful consideration of the evidence, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 21.)

15

The ALJ first noted that the medical evidence of record did not support plaintiff's statements regarding the severity of his symptoms. Despite alleging an onset of disability in June 2015, there were no medical records prior to April 2017, and the medical evidence documented only mild intermittent asthma during the relevant period. During an April 2017 exam, plaintiff appeared healthy and in no acute distress, with normal respirations, good lung expansion, and clear lungs to auscultation. Neurological and musculoskeletal function were also normal. His lungs were still normal during a November 2017 examination. The record contained no evidence of additional abnormalities of physical function during the relevant period. (Tr. at 21.)

The ALJ also found plaintiff's treatment history inconsistent with allegations of disabling symptoms. The record reflected that plaintiff reported improvement in symptoms with largely routine and conservative treatment, managing his symptoms with Advair and ProAir. During an April 2017 appointment, plaintiff reported that his symptoms were well-controlled, and a review of systems showed no complaints, with plaintiff denying a variety of symptoms and the provider noting he was generally healthy and making no changes in his treatment regimen. In November 2017, plaintiff reported that his asthma symptoms had improved, and the provider noted only mild intermittent asthma without complication. (Tr. at 21.)

The diagnostic evidence also failed to support a finding of abnormalities consistent with plaintiff's allegations. April 2017 x-rays of the lungs were normal. An August 2018 CT scan showed a few tiny bilateral pulmonary nodules, and the provider recommended another CT in 12 months. The record contained no pulmonary function studies or additional diagnostics showing abnormalities consistent with plaintiff's alleged debilitating symptoms. (Tr. at 22.)

The ALJ further found plaintiff's reported activities inconsistent with allegations of

16

disabling symptoms of asthma.  In his function report, plaintiff reported some problems with daily activities, but he associated these limitations to his knees, back, arthritis, angioedema, and memory loss, rather than his asthma.  He noted difficulties with gardening and walking extended distances due to asthma and allergies, but all other difficulties were related to pain or swelling issues.  (Tr. at 22.)

Finally, plaintiff alleged that he could not work due to medical impairments, and that the impairments first interfered with his ability to work in 2015.  However, his employment history reflected little to no work from 2010 to 2013.  In November 2017, he told his provider he thought his last boss blacklisted him and that was the reason he could not get a job.  The ALJ concluded that this suggested plaintiff's impairments were not the sole reason for his inability to sustain employment.  (Tr. at 22.)

As for the medical opinion evidence, the agency consultants opined that plaintiff had no severe impairments during the relevant period.  The ALJ found this opinion somewhat persuasive.  (Tr. at 22.)  While the evidence during the relevant period was sparse, the evidence did show that plaintiff's asthma caused more than mild difficulty.  Plaintiff required daily use of Advair, and the ALJ found it reasonable to assume that symptoms could be exacerbated by concentrated exposure to environmental irritants.  (Tr. at 23.)

At step four, the ALJ found that plaintiff could perform his past relevant work as a construction carpenter and commercial cleaner.  (Tr. at 23.)  In the alternative, at step five, the ALJ found that plaintiff could also perform other jobs, as identified by the VE, including assembler, stock worker, and packager.  (Tr. at 24.)  The ALJ accordingly found plaintiff not disabled and denied his application.  (Tr. at 25.)

17

## E. Appeals Council

On November 12, 2020, the Appeal Council denied review. (Tr. at 3.) The Council noted that plaintiff submitted three pages of medical records dated December 15, 1976, but found this evidence did not show a reasonable probability that it would change the outcome of the ALJ's decision. The Council did not exhibit the additional evidence. (Tr. at 4.) When the Appeals Council denies review, the court evaluates the ALJ's decision as the final word of the Commissioner. See Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019).

## III. DISCUSSION

## A. Plaintiff's Argument

Plaintiff argues that his lawyers did not submit a good majority of his medical history.[4] He submits records the Appeals Council did not accept, as well as a letter from his allergy doctor stating that angiodema interferes with his ability to work. He states that the VE was not aware of the effects of his angiodema because this aspect of the case was disregarded. He contends that some of the new evidence that was ignored by the Appeals Council shows that he has had angiodema from a young age and has been re-diagnosed several times. He also provides records of emergency room visits related to asthma, another impairment with which he has long suffered. (Pl.'s Br. at 1.)

Plaintiff indicates that he is pursuing this appeal because the case was judged only on his asthma, when there were other issues his lawyers failed to bring up. Plaintiff contends that his ailments are not going away but in fact are getting worse. He asks for a fair judgment

---

[4]Plaintiff also alleges that he suffered from a stroke causing memory loss, but his wife was not allowed to enter the hearing room with him. However, he does not elaborate on any additional testimony his wife would have provided. (Pl.'s Br. [R. 17] at 1; Pl.'s Rep. Br. [R. 22] at 1.)

18

based on all of the evidence, not just what was submitted by his lawyers. Plaintiff submits copies of hospital bills which he indicates relate to a life threatening episode of angiodema in March 2021 when he experienced laryngeal swelling after receiving the COVID vaccine. (Pl.'s Br. at 2.) He also submits 17 pages of medical records related to asthma, angiodema, and other miscellaneous issues. (Pl.'s Br. at 3; R. 17-1 at 1-17.)

## B.    Review of ALJ's Decision

Plaintiff makes no argument that the ALJ erred in denying the claim based on the evidence that was before him. See Eads, 983 F.2d at 817 ("He cannot be faulted for having failed to weigh evidence never presented to him[.]"). The ALJ applied the correct legal standards, following the five-step evaluation process, and supported his conclusions with substantial evidence from the record. In determining plaintiff's impairments, the ALJ correctly looked for medical signs or laboratory findings substantiating the existence of the impairments alleged during the relevant period, see 20 C.F.R. § 404.1521, and in determining RFC, the ALJ correctly considered the entire record, including the objective medical evidence, medical opinions, and plaintiff's statements, to identify the functional limitations and restrictions resulting from plaintiff's medically determinable impairments, see SSR 96-8p, 1996 SSR LEXIS 5, at *1, *13-14.

The record before the ALJ contained no medical opinion supporting greater limitations than the ALJ found, see Recha v. Saul, 843 Fed. Appx. 1, 5 (7th Cir. 2021) ("[A]n ALJ does not commit an error when 'there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.'") (quoting Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004)), and the ALJ explained why he found plaintiff's allegations of disabling limitations inconsistent with the evidence, a finding this court could reverse only if "patently

19

wrong." <u>Deborah M. v. Saul</u>, 994 F.3d 785, 789 (7th Cir. 2021). The ALJ permissibly relied on the limited medical evidence, mild examination findings, plaintiff's positive response to treatment, his daily activities, and his inconsistent work history and statements about why he could not get a job. <u>See</u> SSR 16-3p, 2016 SSR LEXIS 4, at *18-19 (discussing factors the ALJ should consider).

Plaintiff argues that the record is incomplete. However, he develops no argument that this was the ALJ's fault. While the ALJ has a duty to fully and fairly develop the record, a claimant represented by counsel, as plaintiff was here, is presumed to have made his best case for benefits. <u>Harris v. Saul</u>, 835 Fed. Appx. 881, 885 (7th Cir. 2020) (citing <u>Skinner v. Astrue</u>, 478 F.3d 836, 842 (7th Cir. 2007)). Plaintiff's counsel told the ALJ, at the outset of the hearing, that all evidence related to plaintiff's alleged disability had been submitted, and the ALJ had no reason to believe otherwise. <u>See</u> <u>id.</u> (affirming where the claimant's counsel told the ALJ the record was complete).

## C.    Review of Appeals Council's Decision

Plaintiff's letter-brief could be read as suggesting the Appeals Council erred in its treatment of the additional evidence plaintiff submitted with his request for review. Ordinarily, when the Council denies review, the court evaluates the ALJ's decision as the final word of the Commissioner. <u>E.g.</u>, <u>Jozefyk</u>, 923 F.3d at 496. If, however, the Council denies review despite the submission of additional evidence, a claimant may be able to obtain judicial review of the denial, depending on the grounds upon which the Council declined review. <u>See</u> <u>Stepp v. Colvin</u>, 795 F.3d 711, 722 (7th Cir. 2015). If the Council determined that the claimant's additional evidence was not "new and material," as required by the applicable regulation, <u>see</u> 20 C.F.R. § 404.970, the court retains jurisdiction to review that conclusion for legal error.

20

Stepp, 795 F.3d at 722 (citing Farrell v. Astrue, 692 F.3d 767, 771 (7th Cir. 2012)). If, on the other hand, the Council deemed the evidence new, material, and time-relevant ("qualifying" under the regulation) but then denied review in the exercise of discretion based on its conclusion that the record—as supplemented—did not demonstrate the ALJ's decision was contrary to the weight of the evidence, that decision is unreviewable. Id. (citing Perkins, 107 F.3d at 1294).

Here, the Council stated: "You submitted medical records from Milwaukee Medical Clinic, dated December 15, 1976 (3 pages). We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence." (Tr. at 4.) While the order is less than clear, the absence of any discussion of the content of these records and the refusal to exhibit the records suggests the Council found the evidence non-qualifying. See Musonera v. Saul, 410 F. Supp. 3d 1055, 1063 (E.D. 2019) (relying on these factors to so hold).

But giving plaintiff the benefit of the doubt on reviewability does not lead to remand. The three pages of records at issue relate to an allergy evaluation completed in December 1976, when plaintiff was 10 years old, which indicated that he had perennial allergic rhinitis (year round nasal allergy), bronchial allergy (asthma), and hypersensitivity (allergy) to animal epidermals, specifically cat and dog. (Tr. at 58-60.) It is hard to see how such remote evidence could be time-relevant. Moreover, the ALJ was aware of and discussed plaintiff's history of asthma and allergies, including his attempts to reduce allergens (i.e., dog dander) in his home. (Tr. at 21.) While the 1976 records reference a history of urticaria (hives)[5] (Tr.

---

[5]https://www.mayoclinic.org/diseases-conditions/chronic-hives/symptoms-causes/syc-20352719 (last visited February 15, 2022).

21

at 60), there is no reference to angiodema. The Council did not err in finding that such evidence did not show a reasonable probability of changing the ALJ's decision. See Teresa F. v. Saul, No. 1:18-cv-01967, 2019 U.S. Dist. LEXIS 113380, at *27-28 (S.D. Ind. July 9, 2019) (affirming where the newly submitted evidence was not substantially different than the evidence analyzed by the ALJ).[6]

**D.    Sentence Six Remand**

This leaves the possibility of a sentence six remand. Under this provision, the court may remand a case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g), sentence six. "New" evidence means evidence not in existence or available to the claimant at the time of the administrative proceeding. Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003). Evidence is "material" if there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered. Id. Evidence that has been submitted to and rejected by the Appeals Council does not qualify as "new" within the meaning of § 405(g). Stepp, 795 F.3d at 726 n.8.

Plaintiff develops no argument that any of the additional records he submits satisfy the criteria for a sentence six remand. As the Commissioner notes, none of the attached records are from the relevant period, and some were considered by the ALJ and/or Appeals Council. Other than blaming his lawyers (Pl.'s Rep. Br. at 1), plaintiff does not explain why these records

_____

[6]In reply, plaintiff contends that he faxed other records to the Council. (Pl.'s Rep. Br. at 2.) However, he does not specify the records at issue. In any event, I have considered all of the additional records plaintiff submits under sentence six, which is to his benefit given the Seventh Circuit's holding that records submitted to the Council are not "new." See Stepp, 795 F.3d at 726 n.8.

were not submitted during the administrative proceedings.  See Jensen v. Berryhill, No. 4:16-CV-272, 2018 U.S. Dist. LEXIS 52977, at *18 (E.D.N.C. Mar. 29, 2018) ("Courts have repeatedly held that attorney mistakes are not considered 'good cause' in this context.").  More importantly, for the reasons set forth below, plaintiff cannot show that the records are material. For purposes of discussion, I group the records into three categories.

### 1.    Evidence Already in the Record

Plaintiff submits a number of documents that are already in the record: a portion of Dr. Shaw's January 7, 2020, note indicating "a history of current angiodema" (R. 17-1 at 7; Tr. at 322); a portion of a May 29, 2019, physical therapy note indicating the KT tape triggered angiodema symptoms (R. 17-1 at 11; Tr. at 350); a portion of a December 23, 2019, therapy note referencing an angiodema flare (R. 17-1 at 12; Tr. at 314); a portion of a January 22, 2020, therapy record indicating plaintiff canceled a session due to an angiodema flare (R. 17-1 at 13; Tr. at 343); a portion of a January 31, 2020, note from Dr. Haskins referencing flare-ups with physical therapy (R. 17-1 at 14; Tr. at 344); and a portion of a May 31, 2019, note from Dr. Haskins referencing "a long history of knee pain and . . . bilateral arthroscopic surgery in the 1980s" (R. 17-1 at 15; Tr. at 352).  These notes cannot qualify as new since they were in the record before the ALJ.

Plaintiff develops no argument that the ALJ erred in his consideration of these records. Nor does he explain how records from 2019 and 2020 demonstrate disability between June 2015 and September 2017.  See Eichstadt v. Astrue, 534 F.3d 663, 666 (7th Cir. 2008) ("As for the evidence post-dating Eichstadt's date last insured, the ALJ reasonably concluded that this, too, failed to support Eichstadt's claim. Although this evidence tended to suggest that Eichstadt is currently disabled, and perhaps was disabled during the late 1990s, it provided no

support for the proposition that she was disabled at any time prior to December 31, 1987 [the DLI].").

### 2. Evidence Preceding Alleged Onset

Plaintiff submits a number of records from before the alleged onset date. For instance, he submits an April 4, 2000, note from a visit with Dr. Michael Jones at the Fond du Lac Regional Clinic, in which Dr. Jones states: "My overall feeling is that he does have hereditary angiodema. David has not had any attacks since his last episode and I have given him a lab slip to check his C4 level if he has a recurrent episode. If this is also depressed, then I have told him I will refer him to Allergy for a definitive opinion on hereditary angiodema." (R. 17-1 at 5.) On April 10, 2000, plaintiff returned to Dr. Jones following another episode of angiodema. Dr. Jones continued to express uncertainty based on the testing and plaintiff's "unusual manifestation. . . . Nevertheless, I do think he has an angiodema syndrome which is brought on by illness and trauma. His symptoms have pretty much gone away and he is back to normal presently." (R. 17-1 at 6.) On exam, Dr. Jones noted no urticaria or angiodema. He referred plaintiff to an allergy specialist to "get his opinion regarding treatment for this disorder if present" and provided samples of Zyrtec to take at onset of symptoms. (R. 17-1 at 6.)

While these notes provide at least a provisional diagnosis of angiodema, they were created more than 15 years prior to the alleged onset date, and they contain no discussion of impairment severity or related limitations. See Richards v. Berryhill, 743 Fed. Appx. 26, 30 (7th Cir. 2018) ("[P]ointing to various diagnoses and complaints and saying that they might hinder Richards is insufficient to establish the existence of a functional limitation."). Moreover, the record shows plaintiff working from 2000 to 2009, with steadily increasing earnings. (Tr. at 176.) Medical records preceding the period at issue can be relevant, but absent evidence of

24

plaintiff's angiodema substantially worsening or altering plaintiff's ability to work during the relevant claim period it is hard to see how this evidence could have altered the ALJ's determination. See Pepper v. Colvin, 712 F.3d 351, 364 (7th Cir. 2013) (citing Eichstadt, 534 F.3d at 666).

Plaintiff also submits a November 21, 2002, note related to a visit with Dr. Jones regarding asthma. Plaintiff's asthma medication had recently been removed from the market, and he was seeking a refill of albuterol provided by an urgent care physician. On exam, his lungs were completely clear to auscultation with no wheezing. Dr. Jones assessed mild persistent asthma, providing samples of Pulmicort inhalers. (R. 17-1 at 1.) The ALJ considered the evidence of plaintiff's mild asthma during the relevant period (Tr. at 21); this note would not have changed his analysis. The note included, in the problem list, "History of urticaria and angiodema" (R. 17-1 at 1), but Dr. Jones did not further discuss the nature or severity of those conditions. It is thus hard to see how this historical reference from 13 years prior to the alleged onset date would have changed the outcome. See Pepper, 712 F.3d at 364.

Plaintiff further submits one page from a June 3-4, 2015, emergency room admission related to lower chest and epigastric abdominal pain. He received a DuoNeb treatment, after which he felt much better. Cardiac testing was negative, and the doctor suspected an asthma exacerbation causing chest heaviness. "The primary encounter diagnosis was Asthma exacerbation, mild intermittent." (R. 17-1 at 2.) This note, too, is from prior to the alleged onset date (although just before). More importantly, it relates to a diagnosis of which the ALJ was

25

aware and considered in reaching his decision.[7]  As the ALJ noted, the record documented no significant asthma symptoms or exacerbations during the relevant period.

Finally, plaintiff submits the second page of the three-page submission he made to the Appeals Council related to his December 1976 allergy work-up.  (R 17-1 at 4.)  Because this evidence was submitted to the Council, it does not qualify as "new."  Stepp, 795 F.3d at 726 n.8.  Moreover, it is hard to see how such remote evidence could impact the ALJ's decision regarding the 2015-17 period at issue.[8]

### 3.    Evidence Post-DLI

Plaintiff submits a number of records post-dating the period at issue.  For instance, he submits one page related to a December 5, 2019, emergency room visit "for evaluation of shortness of breath.  The patient states he has been experiencing shortness of breath similar to his asthma exacerbation since yesterday after his shoulder surgery.  The patient reports not being able to use his ProAir and Advair due to trouble breathing.  Denies chest pain or leg

---

[7]The note says nothing about angiodema.  The note is labeled "Page 11," suggesting an incomplete submission regarding this encounter.  See 20 C.F.R. § 1512(a) ("When you submit evidence received from another source, you must submit that evidence in its entirety, unless you previously submitted the same evidence to us or we instruct you otherwise.").

[8]In reply, plaintiff indicates he was unaware there was a deadline for filing for social security.  (Pl.'s Rep. Br. at 1.)  As the court explained in Eichstadt, waiting to file an application does not, in itself, doom the application, although a long lapse in time may create evidentiary problems.  534 F.3d at 666.  Plaintiff contends that he clearly had medical issues prior to June 5, 2015, which according to the ALJ and social security was the alleged onset.  (Pl.'s Rep. Br at 1.)  Plaintiff selected June 5, 2015, as the onset date in his application.  (Tr at 156.)  In his disability report, he stated that he stopped working on June 5, 2015, because of his conditions.  (Tr. at 183.)  Moreover, as discussed above, the issue is not whether plaintiff had complications related to asthma or angiodema in 1976 or 2000, but rather whether he became disabled between 2015 and 2017.  Plaintiff indicates in reply that he was discharged from the Army due to health issues in 1986, but he submits to evidence in support, nor does he explain how this supports disability beginning in June 2015, particularly given his ability to work in the interim.  (Pl.'s Rep. Br. at 2.)

26

swelling. Denies leg pain." (R. 17-1 at 3.) The note pertains to asthma, a condition the ALJ considered, and makes no mention of angiodema. While this note appears to reflect an exacerbation of plaintiff's asthma, it occurred more than two years after the DLI. Further, because plaintiff submits just one page from this visit, I cannot determine what the provider diagnosed or what treatment was offered, nor can I determine whether the problem was otherwise related to the previous day's surgery.

Plaintiff next submits a note of a January 15, 2020, phone call, in which Dr. Shaw: "Explained that his labs are consistent with the diagnosis of hereditary angiodema." (R. 17-1 at 8.) While this note confirms the diagnosis, it was created more than two years after the DLI. Plaintiff also submits a note from a January 31, 2020, follow-up with Dr. Haskins. "He comes today with concern about angiodema flareup after physical therapy. He believes that it occurs with palpation of one area of the scapula in particular. He has severe swelling of the face, scrotum, and extremities when this occurs. He had angiodema for many years, but it is increasing in frequency currently." (R. 17-1 at 9.) This note, too, was created more than two years post-DLI and further suggests that the condition was then worsening in the context of plaintiff's recent surgery and physical therapy. Records from medical treatment taking place after the date late insured "are relevant only to the degree that they shed light on [the claimant's] impairments and disabilities from the relevant insured period." Million v. Astrue, 260 Fed. Appx. 918, 921-22 (7th Cir. 2008). These records do not permit evaluation of plaintiff's condition during the relevant period.

Plaintiff also submits a May 19, 2021, letter from Dr. Shaw, stating:

He has been diagnosed with hereditary angiodema, a condition that places him at risk for both peripheral and laryngeal swelling episodes. While the laryngeal episodes can be life-threatening, the peripheral episodes can definitely affect the

27

patient's ability to function. Manual labor jobs involving frequent use of the hands are especially problematic in this condition as they typically result in frequent episodes of swelling that can persist up to 3 to 4 days. The patient is currently in the process of seeking treatment that can provide better control of this condition. Once treatment is hopefully approved and instituted, these types of jobs may be able to be better tolerated.

In the meantime, I would recommend that the patient avoid any jobs that include manual labor utilizing the hands or frequent, repetitive hand use.

(R. 17-1 at 10.)

While Dr. Shaw provides current restrictions related to angiodema in this letter, he does not relate those restrictions to the relevant period.[9] See Heck v. Comm'r of SSA, No. 1:20CV2133, 2021 U.S. Dist. LEXIS 251791, at *37 (N.D. Ohio Dec. 28, 2021) (denying sentence six remand based on "opinions that post-date the ALJ's decision, with no explicit information suggesting that they relate back to the time-period at issue"), adopted, 2022 U.S. Dist. LEXIS 14509 (N.D. Ohio Jan. 26, 2022). Dr. Shaw also suggests that with treatment the restrictions could be removed. See Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (noting that a condition controlled by medication is not disabling).

In reply, plaintiff contends that his conditions are getting worse, as stated in Dr. Shaw's letter. (Pl.'s Rep. Br. at 1.) As discussed above, the issue is not whether plaintiff is currently disabled but rather whether he became disabled prior to the DLI. See Schloesser, 870 F.3d at 717; see also Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999) (holding that a medical

---

[9]Dr. Shaw first saw plaintiff in January 2020. (Tr. at 322.) While a medical source may provide a retrospective analysis, such "analysis generally must be corroborated by evidence contemporaneous with the eligibility period." Aulik v. Berryhill, 711 Fed. Appx. 806, 808 (7th Cir. 2018) (citing Liskowitz v. Astrue, 559 F.3d 736, 742 (7th Cir. 2009); Allord v. Barnhart, 455 F.3d 818, 822 (7th Cir. 2006)). The record is missing such evidence here. Thus, it is difficult to see how Dr. Shaw—or any medical source—could provide an opinion, grounded in the requisite legitimate medical basis, that plaintiff's angiodema produced disabling limitations between June 5, 2015, and September 30, 2017. See id. (citing Eichstadt, 534 F.3d at 667).

28

opinion post-dating the ALJ's decision could be relevant to whether a deterioration in the claimant's condition subsequently entitled her to benefits, but it was not relevant to the period at issue). Plaintiff also complains that the state agency doctors never saw him and based their opinions on incomplete information. (Pl.'s Rep. Br. at 1.) However, plaintiff submits no medical opinion evidence of his own pertinent to the relevant period.

Finally, plaintiff submits copies of bills for services on 3/26/21 and 3/27/21. (R. 17-1 at 16-17.) While he contends that these bills relate to an angiodema episode, there are no records to substantiate that assertion. And as with the other evidence in this category, it significantly post-dates the DLI.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 16th day of February, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

29